Case 4:13-cv-00753-A Document 85 Filed 03/30/15 Page 1 of 18 PageID 4865

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR 30 2015

CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| THE DALLAS/FORT WORTH INTERNATIONAL AIRPORT BOARD, | § § § § § § § § § § § | |
| Plaintiff, | | |
| VS. | | NO. 4:13-CV-753-A |
| INET AIRPORT SYSTEMS, INC., ET AL., | | |
| Defendants. | | |

MEMORANDUM OPINION AND ORDER

Now pending are motions for partial summary judgment and summary judgment filed, respectively, by plaintiff, The Dallas/Fort Worth International Airport Board ("DFW"), and defendants, INET Airport Systems, Inc. ("INET"), Michael F. Colaco ("Colaco"), and Hartford Fire Insurance Company ("Hartford"), as well as objections by each to the summary judgment evidence of the opposing party. The court, having considered the motions, responses, and replies, the summary judgment evidence, and applicable authorities, finds that plaintiff's motion should be granted in part and denied in part and that defendants' motion should be granted.

I.

Background

In 2009, DFW and INET entered into a contract for installation of certain air conditioning equipment at Terminal E

of the Dallas/Fort Worth International Airport. The contract was bonded by Hartford. The contract provided, in pertinent part, that INET install rooftop air conditioning units that were required to operate from a central utility plant that provided ethylene glycol/water ("EG/W") to the gates at subfreezing temperatures. INET determined that the plans contained a design flaw in that the EG/W could generate condensate that might freeze and burst the coils, cause the units to malfunction, and create an environmental hazard. DFW disagreed (or now claims to have disagreed). This case arises out of the inability of DFW and INET to resolve their dispute.

DFW filed its original petition in the 17th Judicial District Court of Tarrant County, Texas, on August 5, 2013. Defendants filed a notice of removal, bringing the case before this court. On September 30, 2013, DFW filed its first amended complaint asserting causes of action for breach of contract against INET, individual liability of Colaco as officer and director of INET, which had by then dissolved, and liability of Hartford under the performance bond it issued related to the contract. DFW also sought attorney's fees and costs. Defendants answered, asserting sixteen affirmative defenses. INET and its successor, INET Airport Systems, LLC, asserted counterclaims against DFW for breach of contract, unjust enrichment, and money

2

had and received, and sought to recover attorney's fees and costs. DFW answered and asserted affirmative defenses to the counterclaims.[1]

## II.

### Summary Judgment Motions

DFW's motion for partial summary judgment seeks judgment as to breach of contract (but not damages), inability of INET to prevail on its counterclaims, and inability of INET to prevail on its affirmative defenses.

Defendants' motion seeks judgment as to their second and fourth affirmative defenses of excuse and prior material breach and their eighth affirmative defense that DFW's claim for liquidated damages is illegal and unenforceable. In addition, Hartford seeks judgment that DFW's claim on the performance bond is barred by limitations.

## III.

### Applicable Summary Judgment Principles

Rule 56(a) of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact and the

---

[1] Of note in DFW's answer are its admissions that it "lacks knowledge or information sufficient to form a belief as to the truth of what the temperature of the EG/W solution is once the EG/W solution enters the Rooftop Air Handling Units" and "the design of the system was based on an assumption that the Rooftop Air Handling Units could receive a sub-freezing EG/W solution." Further, DFW admits that no change order was issued for the scope of work to be performed by INET.

3

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The movant bears the initial burden of pointing out to the court that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). The movant can discharge this burden by pointing out the absence of evidence supporting one or more essential elements of the nonmoving party's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Once the movant has carried its burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to each of the challenged elements of its case. Id. at 324; see also Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party as to each essential element of the nonmoving party's case, there is no genuine dispute for trial and summary judgment is appropriate. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 597 (1986). In Mississippi Prot. & Advocacy Sys. v. Cotten, the Fifth Circuit explained:

4

> Where the record, including affidavits, interrogatories, admissions, and depositions could not, as a whole, lead a rational trier of fact to find for the nonmoving party, there is no issue for trial.

929 F.2d 1054, 1058 (5th Cir. 1991).

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law.[2] Celotex Corp., 477 U.S. at 323. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita, 475 U.S. at 597; see also Mississippi Prot. & Advocacy Sys., 929 F.2d at 1058.

## IV.

### Objections to the Summary Judgment Evidence

Each party has filed objections to the summary judgment evidence of the opposing party. Rather than strike any of the summary judgment evidence, the court is giving it whatever weight, if any, it may deserve.

---

[2] In Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), the Fifth Circuit explained the standard to be applied in determining whether the court should enter judgment on motions for directed verdict or for judgment notwithstanding the verdict.

5

V.

## Undisputed Evidence

The following is an overview of evidence[3] pertinent to the motions for summary judgment that is undisputed in the summary judgment record:

DFW and INET entered into a contract dated August 6, 2009, for work on air conditioning units associated with jet bridges at Terminal E at DFW International Airport. Specifically at issue is the requirement that INET install preconditioned air units and roof-top air handling units for use with 30% ethylene glycol/water. Campos Engineering provided the engineering design for the project on behalf of DFW. On September 25, 2009, DFW issued its notice to proceed, stating that the substantial completion date of the contract would be August 5, 2010.

The contract agreement consists of a number of parts and totals 565 pages. Paragraph 50-3 of the general provisions says that all of the parts are intended to be complementary, but in case of discrepancy, "Contract Forms shall govern over Special Provisions, Special Provisions shall govern over General Provisions, General Provisions shall govern over Plans . . ." DFW 070. Paragraph 50-3 further provides that the contractor not take

---

[3]Because of the length of the summary judgment record, for convenience, the court is referring to DFW's evidence as "DFW __" and to Defendants' evidence as "INET __."

advantage of any apparent error or omission, but rather bring it to the owner's attention immediately.

Provisions pertinent to the bidding process for the contract are part of the contract General Provisions. In particular, paragraph 20-6 says:

> EXAMINATION OF PLANS, SPECIFICATIONS, AND SITE. The bidder is expected to carefully examine the site of the proposed work, the proposal, plans, specifications, and contract forms. He shall satisfy himself as to the character, quality, and quantities of work to be performed, materials to be furnished, and as to the requirements of the proposed contract. The submission of a proposal shall be prima facie evidence that the bidder has made such examination and is satisfied as to the conditions to be encountered in performing the work and as to the requirements of the proposed contract, plans, and specifications.

DFW 063.

The Special Provisions include a warranty of construction by the contractor, INET. However,

> [u]nless a defect is caused by the negligence of the Contractor or subcontractor or supplier at any tier, the Contractor shall not be liable for the repair of any defects of Owner furnished material or design furnished by the OWNER or for the repair of any damage that results from any defect in material or designs furnished by the OWNER.

Special Provisions, ¶ 6.0(D), DFW 044. The contract further provided that:

> In case of conflict, discrepancies, errors or omissions among the various Contract documents, the matter shall be submitted by Contractor to the Construction Manager for decision, and such decision shall be final. Any

7

>   Work affected by such conflicts, discrepancies, errors
>   or omissions which is performed prior to the
>   Construction Manager determination shall be performed
>   at the Contractor's risk.

Special Provisions, ¶ 31.0.

With regard to scope of work, the contract provided that DFW had the right to make such alterations as necessary or desirable to complete the work and that any such changes would be covered by change orders issued by DFW. General Provisions, ¶ 40-2, DFW 067. The contract further provided for extra work, which would also be reflected by change orders containing agreed price and adjustment to contract time if necessary. Id., ¶ 40-4, DFW 067. Any payment for extra work not covered by written agreement would be rejected by DFW. Id.

With regard to control of work, the engineer was to decide all questions as to contract interpretation and manner of performance. General Provisions, ¶ 50-1, DFW 070. Work done contrary to the instructions of the engineer or any extra work done without authority would be considered unauthorized and would not be paid for under the contract. Id., ¶ 50-10, DFW 072.

At a construction kick-off meeting on October 14, 2009, INET expressed concern over whether certain McQuay rooftop units would function correctly with subfreezing temperatures of glycol passing through the coils. (McQuay was one of the brands

authorized to be used pursuant to the contract. It appears that INET had based its bid on use of McQuay equipment. What is not clear is whether INET was then required to use McQuay equipment since that is what its bid was based on. It appears from INET's letters that INET believed that to be the case. E.g., DFW 571, 572.) INET formally presented this issue in a request for information(R-002)dated Nov. 17, 2009. DFW 569. DFW responded that the unit would work, but that the specification needed to be changed to include a defrost cycle in the control sequence for the air handling units. INET 795. INET continued to express concern about the McQuay units and ultimately determined that none of the brands specified in the contract would function properly as per the design of the engineer. DFW 578,  Internal correspondence between DFW and Campos Engineering shows that the piping connection design had to be changed for the units to work. INET 790 (we need to fix the specifications); INET 793 (need to revise some parts of the specification section); INET 800 (reconfirmed that McQuay units will operate as designed, however, they do not have a recommended sequence to prevent coils from freezing); INET 810 (INET is going to ask for an extension of time and money; need to add 3-way control valve, temperature sensor and circulation pump); INET 816 (piping design different than what was originally submitted); INET 825 (please have this

formally submitted to Campos as a change to design); INET 925 (need to prepare the change order for INET before tomorrow's meeting). DFW never issued a change order or request for proposal to INET, despite INET's request. INET 819; 177; DFW's answer at 7, ¶¶ VI.D.32, VI.D.35. Instead, DFW insisted that INET either comply with the original plans and specifications or pursue an acceptable alternative.

By letter dated Aug. 11, 2010, DFW gave notice to INET that it had failed to achieve milestone 1, substantial completion, by Aug. 5, so DFW would be assessing liquidated damages of $500 per day until the work was complete. DFW 602. By letter dated Apr. 14, 2011, DFW notified INET that it was in default and DFW would proceed against the performance bond. DFW 617. INET responded by letter dated April 21, 2011, explaining why it was not in default. DFW 585. (An earlier letter, dated February 28, 2011, summarized its correspondence and DFW's failure to adequately respond. DFW 589.) Again, by letter of Aug. 22, 2011, INET denied that it was in default, summarizing what had happened and, in addition, offered to complete the work at no additional cost if DFW would just issue a change order. DFW 589.

By letter dated Nov. 21, 2011, DFW claimed that INET had failed and refused to provide pricing "on the piping revision design," and that the delays to the contract were the "result of

10


INET's stubborn refusal to supply air handling units which have been fully backed by the manufacturer." INET 784. The record does not support the allegations of the letter.

By letter dated April 23, 2012, DFW issued an ultimatum to Hartford and INET to agree to perform the work outstanding on the contract or the contract would be terminated. INET 854. Having been granted an extension of time to respond, by letter dated May 21, INET said it would proceed with construction exactly as DFW had demanded. INET 856. Ignoring INET's letter, by findings of fact dated May 25, 2012, the project manager recommended termination of the contract. INET 860. The form attached to the recommendation says in the "description" section: "This action will terminate Contract No. 9500377, Restore PCA Terminal E with INET Airport Systems, Inc. Of Fullerton, California." INET 861. This same document appears in the agenda for the board meeting of June 7, 2012. INET 939. Another presentation states that the purpose of the of board action is to terminate the contract. INET 872. The minutes of the June 7 board meeting state that the board unanimously adopted the resolution terminating the contract. INET 943. Later internal correspondence confirms the termination. INET 908, 913, 921.

The order for work to complete the contract was not issued until July 2013. INET 921. The contract was never re-bid,

contrary to DFW's representation that "DFW is prohibited by law from simply contracting with a new entity without complying with contracting requirements for governmental entities." Pl.'s reply at 7. Instead, a business decision was made to use Centennial to do the work. INET 920. And, DFW paid almost $400,000 more than it had estimated the work would cost. INET 1024; 1026.

On August 5, 2013, DFW filed its original petition in state court, after trying unsuccessfully to get Hartford to sign a tolling agreement.

VI.

Analysis

A. DFW's Motion.

DFW says that it is entitled to judgment because there was a contract between the parties, INET breached the contract by failing to meet the substantial completion date, and, INET's breach was not excused or justified.[4]

There is no dispute about the contract and the documents that comprise it. Further, the work required by the contract was not completed. The question is which party first breached the contract.

---

[4]DFW alternatively argues that INET breached the contract by reason of its dissolution. There is no need to address this ground, however, as the summary judgment evidence establishes that the dissolution took place after DFW had terminated the contract. Moreover, the dissolution was part of a reorganization with a similarly named entity taking INET's place. The contract provides that it inures to the benefit of, and is binding on, successors and assigns. Special Provisions, ¶ 30.0.

12

DFW alleges that the contract placed the risk of defects on INET. DFW relies on *Lonergan v. San Antonio Loan & Tr. Co.*, 101 Tex. 63, 104 S.W.1061 (1907), which holds that a contract must specifically state that the owner, rather than the contractor, bears the risk of inadequate plans. In particular, DFW relies on general provision 20-6 regarding examination of plans, specifications, and site. *See Interstate Contracting Corp. V. City of Dallas*, 407 F.3d 708, 717 (5th Cir. 2005).

As INET points out, the contract also contains special provision 6.0(D), which says that unless the contractor is negligent, it is not liable for the repair of any defects or damages that result from any defect in designs furnished by the owner. In addition, other contract provisions are contrary to an allocation of risk to the contractor. For example, special provision 5.0 sets forth a procedure for the contractor to obtain an adjustment based on differing site conditions, which would not be allowable if the contract shifted the risk to INET. Other provisions allow DFW to make changes to the contract and provide that DFW will pay for extra or different work. Also, the language of the contract at issue is different from the language in *Interstate Contracting*, which specifically said that the contractor would make no claims for damages or additional compensation or extension of time because of encountering

13

different conditions or having to do different work than anticipated or estimated. 407 F.3d at 721.

To the extent there is any ambiguity in the contract, the special provisions govern over the general and the contract is to be construed against the drafter. *Gonzalez v. Mission American Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990). Here, the language of the contract is more like that in Fleetwood than Lonergan. North Harris County Junior College Dist. V. Fleetwood Constr. Co., 604 S.W.2d 247, 253 (Tex. App.-Houston 1980, writ ref'd n.r.e.)(where the contractor was to report any errors, inconsistencies or omissions to the architect and would not be liable for any damages resulting from those errors, inconsistencies or onmissions in the contract documents). DFW's refusal to acknowledge the issues raised by INET and issue appropriate change orders constitutes a breach of the contract. Id. at 253-54. See Beard Family Partnership v. Commercial Indem. Ins. Co., 116 S.W.3d 839, 847 (Tex. App.-Austin 2003, no pet.)(citing United States v. Spearin, 248 U.S. 132, 136 (1918)).

The second part of DFW's motion is devoted to an attack on INET's counterclaims and affirmative defenses. The primary argument is that INET forfeited its right to proceed by failing to pay state franchise taxes. (This was the subject of an earlier motion in which the court pointed out that DFW was relying on

14

incorrect statutory provisions.) The summary judgment record shows that INET has been reinstated and did not owe any taxes. Texas law is clear that once taxes are paid, the disability is removed and the party may sue and defend all actions, no matter when they arose.[5] *Mello v. A.M.F. Inc.*, 7 S.W.3d 329, 331 (Tex. App.--Beaumont 1999, pet. denied); *G. Richard Goins Constr. Co. v. S.B. McLaughlin Assocs., Inc.*, 930 S.W. 2d 124, 128 (Tex. App.--Tyler 1996, writ denied).

DFW then argues that, assuming INET is authorized to pursue its claims, INET's claims fail for the same reasons that DFW should prevail on its claims. As discussed, supra, DFW cannot prevail on its claims.

DFW next argues that INET cannot prevail on its alternate claims for unjust enrichment and money had and received, because of the contract between the parties. The court agrees. <u>Texas Star Motors, Inc. V. Regal Fin. Co., Ltd.</u>, 401 S.W.3d 190, 202 (Tex. App.-Houston [14th Dist.] 2012, no pet.); <u>Edwards v. Mid-Continent Office Distribs., L.P.</u>, 252 S.W.3d 833, 837 (Tex. App.-Dallas 2008, pet. denied).

Finally, DFW summarily contends, in a one paragraph afterthought, that INET cannot produce evidence to create a fact

---

[5] Apparently recognizing this to be the case, DFW tries a new tack in its reply, arguing that "INET did not assert a counterclaim against DFW." Reply at 9. The counterclaim is clearly asserted by both INET entities, the original contracting party and its successor in interest.

issue as to any of its affirmative defenses. For the reasons discussed herein, that contention is moot. In any event, INET devotes 21 pages of its response to a discussion of evidence supporting its defenses. And, as the court has determined, INET is entitled to judgment that DFW prevented it from performing under the contract.

B. <u>Defendants' Motion.</u>

Defendants urge three grounds in support of their motion. The first, that INET's performance under the contract was prevented by DFW's breach of the contract, has already been addressed. The third, that DFW's claim for liquidated damages is illegal and unenforceable, is now moot. And, the second is that the claims against Hartford are barred by limitations.

A suit on a performance bond may not be brought after the first anniversary of the date of final completion, abandonment, or termination of a public contract. Tex. Gov't Code § 2253.078. Here, the summary judgment evidence establishes that the contract was terminated on June 7, 2012. The suit was not filed until August 5, 2013. Hence, the claim against Hartford is not timely. <u>Hartford Fire Ins. Co. V. City of Mont Belvieu</u>, 611 F.3d 289, 294 (5th Cir. 2010).

Even if the court accepted DFW's absurd argument that it had not terminated the contract, DFW clearly takes the position that

16

INET did no work on the contract after October 2010 and that INET would not do any further work. Thus, under DFW's own analysis, the contract was abandoned years before it filed suit.

C.  <u>Other Issues.</u>

Although Defendants did not seek judgment as to their counterclaim for breach of contract, DFW does not dispute that it is withholding monies on work that was completed by INET. It appears to the court that the parties should be able to agree on the amounts withheld and not require further proceedings in that regard.

## VII.

### Order

In accordance with the discussion herein, the court ORDERS that:

(A) DFW's motion for summary judgment be, and is hereby, granted as to Defendants' requests for relief under theories of unjust enrichment and money had and received;

(B) DFW's motion for summary judgment be, and is hereby, otherwise denied;

(C) Defendants' motion for summary judgment be, and is hereby, granted;

and,

(D) DFW's claims against Hartford be, and are hereby, dismissed with prejudice.

The court determines that there is no just reason for delay in, and hereby directs entry of, final judgment as to the dismissal of DFW's claims against Hartford.

The court directs the parties to take into account these rulings in preparing their joint pretrial order.

SIGNED March 30, 2015.

_____
JOHN McBRYDE
United States District Judge